AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
District of Delaware

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Tan Apple iPhone<br>CURRENTLY LOCATED AT: New Castle County Police<br>Department, 3601 North DuPont Highway, New Castle, DE 19720 | )<br>)<br>)   Case No. 25-516M<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Tan Apple iPhone, CURRENTLY LOCATED AT: New Castle County Police Department, 3601 North DuPont Highway, New Castle, DE 19720 (as more fully described in Attachment A-2, incorporated herein).

located in the _____ District of _____ Delaware _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B-2", incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 922(g)(1) | Possession of a Firearm by a Person Prohibited |
| 21 U.S.C. 841 | Possession of a Controlled Substance with Intent to Distribute |
| 21 U.S.C. 846 | Conspiracy to Distribute a Controlled Substance |

The application is based on these facts:

See Affidavit of Probable Cause, incorporated herein.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ Andrew P. Rosaio
*Applicant's signature*

Andrew P. Rosaio, Task Force Officer, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Telephone _____ *(specify reliable electronic means)*.

Date:  _____ 09/24/2025 _____

_____
*Judge's signature*

City and state:  Wilmington, Delaware

The Honorable Sherry R. Fallon, U.S. Magistrate Judge
*Printed name and title*

| Print | Save As... | Attach | Reset |
|---|---|---|---|

**IN THE UNITED STATES DISTRICT COURT**
**FOR DISTRICT OF DELAWARE**

IN THE MATTER OF THE SEARCH OF
A black Apple iPhone in a black case, a tan
Apple iPhone, a black Apple iPhone in a
black case, and a purple Apple iPhone,

CURRENTLY LOCATED AT:

New Castle County Police Department
3601 N Dupont Hwy
New Castle, DE 19720

Case No. _____

**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR A SEARCH WARRANT**

I, Andrew P. Rosaio, a Task Force Officer with the Federal Bureau of Investigation

("FBI"), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1)  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal
    Procedure for a search warrant authorizing the forensic examination of property—four cellular
    phones—which is currently in law enforcement possession and the extraction from that
    property of identifying electronically stored information described in Attachments B-1 through
    B-4.  The property to be searched is a black Apple iPhone in a black case ("**TARGET
    DEVICE 1**"), a tan Apple iPhone ("**TARGET DEVICE 2**"), a black Apple iPhone in a black
    case ("TARGET DEVICE 3"), and a purple Apple iPhone ("**TARGET DEVICE 4**," and,
    together with **TARGET DEVICE 1**, **TARGET DEVICE 2**, AND **TARGET DEVICE 3**,
    the "**TARGET DEVICES**").  **TARGET DEVICES 1 and 2** were found in a green Dodge
    Charger driven by Daronce Beulah ("**BEULAH**").  **TARGET DEVICES** 3 and 4 were found
    in a red Tesla sedan driven by Karon Phillips ("**PHILLIPS**").  **BEULAH** and **PHILLIPS**

1

were both arrested by New Castle County Police Department ("NCCPD") police officers, at which time the arresting officers lawfully seized the **TARGET DEVICES** incident to arrest. The **TARGET DEVICES** are currently located at the NCCPD, 3601 N Dupont Hwy, New Castle, DE 19720. The applied-for warrant would authorize the forensic examination of the **TARGET DEVICES** for the purpose of identifying electronically stored data particularly described in Attachments B-1 through B-4.

2) I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18 U.S.C. § 2516. I am also a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3) I have been employed by the NCCPD since June of 2012 and am currently assigned as a Detective in the Special Investigations Unit, attached to the High Risk Offenders Team. I am also currently assigned with the FBI as a Task Force Officer since January of 2020. I am a graduate of the New Castle County Police Academy and have attended further training in gang investigations, firearm investigations, drug trafficking investigations, and the investigation of violent offenders. I was also previously assigned to the Mobile Enforcement Team and Safe Streets Task Force.

4) I have actively participated in investigations of criminal activity, including but not limited to the investigation of drug trafficking. During these investigations, I have also participated in the execution of search warrants and the seizure of evidence relating to drug trafficking activities. As a Task Force Officer of the FBI and Detective with the NCCPD, I have testified

2

under oath, applied for and executed search and arrest warrants, and participated in and gained experience in Title III wire intercept investigations for the enforcement of federal and state laws. I have also personally conducted, managed, and participated in investigations that have resulted in the arrest and conviction of numerous individuals responsible for trafficking narcotics and committing violent crimes.

5) I have also been involved in Organized Crime Drug Enforcement Task Force ("OCDETF") investigations involving drug trafficking organizations. As a result of this and other narcotics-related investigations, I have experience in debriefing defendants, informants, participants, and various other people who have direct experience with the methods used to distribute controlled substances.

6) Based on my training and experience as a NCCPD Detective and a Task Force Officer of the FBI, I am familiar with the means and methods that narcotics traffickers use to import and distribute illicit drugs. I am acquainted with the support and assistance that narcotics organizations require to conduct their illegal activities. I have become knowledgeable about the criminal statutes of the United States, particularly the criminal laws relating to federal narcotics, firearms, and conspiracy offenses.

7) The facts in this affidavit come from my personal observations, my review of subpoenaed and other records, my training and experience, and information obtained from other agents/Task Force Officers/law enforcement members, confidential sources, and witnesses. This affidavit is intended to show merely that sufficient probable cause for a search warrant exists, but it does not set forth all of my knowledge about this matter.

8) Based upon that training and experience, I have learned the following:

a.      Drug trafficking is an ongoing and recurring criminal activity.  Unlike crimes against people, which tend to be discrete offenses, drug trafficking is an illegal commercial activity that is characterized by regular, repeated criminal activity;

b.      Because drug-trafficking is illegal and an inherently dangerous activity, many drug traffickers possess firearms or ammunition to protect themselves, their products, and their profits;

b.      Cell phones are an indispensable tool of the drug trafficking trade. Drug traffickers use cell phones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators and firearms traffickers.  In addition, traffickers will often change their cell phones following an arrest, or use multiple cell phones in order to frustrate law enforcement efforts;

c.      Drug traffickers keep and maintain records of their various activities. Such records are regularly concealed in a suspect's automobile, residence, office, and on his person, and that they take various forms.  Documents commonly concealed by traffickers include but are not limited to notes in code, deposit slips, wired money transactions, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators.  These items are kept in locations that are considered safe by

4

the traffickers such as safety deposit boxes, residences, vehicles and on their person, where they have ready access to them;

     d.    Drug traffickers and those illegally in possession of illegal drugs and firearms or ammunition use one or more cell phones and other electronic communications devices to facilitate illegal drug or firearm/ammunition transactions. The electronically stored information on these devices is of evidentiary value in identifying other members of the drug trafficking conspiracy and establishing the relationship between these people, including photographs and other identifying information stored on these devices;

     e.    Drug traffickers use computers or other electronic storage media, including smartphones, to store the records documents, or items listed above;

     f.    People involved with illegal drug possession also frequently use cell phones, communication devices, and other electronic media storage to further their illegal activities. People who have illegal drugs tend to take pictures of the drugs and contraband or firearms/ammunition, which are stored on their electronic devices. Those people may communicate with others through their electronic devices about purchasing or selling drugs or firearms/ammunition, and they often post pictures of evidence, fruits, and instrumentalities of crime on social media to show others with whom they are connected; and

     g.    Further, people involved in illegal activities tend to use their cell phones to call or text accomplices before, during, and after a crime has been committed. In the case of a drug transaction, drug sellers and purchasers often communicate to arrange drug transactions using one or more cell phones. And sometimes, when a person commits a crime, an accomplice will be nearby to serve as a lookout for police. The person may then

contact the accomplice via an electronic device for assistance fleeing the crime scene. Additionally, a person may communicate with another person to strategize and attempt to hide belongings or merchandise from the crime committed. As mentioned before, people tend to take pictures of property or items taken in connection with crimes committed, to share that information with others, or to store it on electronic devices.

9) Because this affidavit is being submitted for the limited purpose of establishing probable cause to search the **TARGET DEVICES**, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this affidavit is based upon my personal knowledge, my review of documents and law enforcement reports, as well as conversations with law enforcement officers and other people. All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated.

10) Based on my training, experience, and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code Section 841 (Possession of a Controlled Substance with Intent to Distribute) and Section 846 (Conspiracy to Distribute a Controlled Substance), have been committed by **BEULAH** and **PHILLIPS**, and a violation of Title 18, United States Code Section 922(g)(1) (Possession of Ammunition by a Person Prohibited), has been committed by **BEULAH** (together, the "**TARGET OFFENSES**"). I believe, based on the facts below, that the **TARGET DEVICES** were possessed by **BEULAH** and **PHILLIPS** and that **BEULAH** and **PHILLIPS** used the **TARGET DEVICES** to further their drug-trafficking activities and **BEULAH's** possession of ammunition. There is probable

6

cause to believe that the **TARGET DEVICES** would have information regarding **BEULAH's** and **PHILLIPS's** drug transactions and possession with intent to distribute drugs.  I believe the **TARGET DEVICES** may provide information on the source of drugs found in **BEULAH's** and **PHILLIPS's** possession, whether physical or constructive.  As a result, I believe there is probable cause to search the information described in Attachments A-1 through A-4 for the things described in Attachments B-1 through B-4.

11) This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## SUMMARY OF PROBABLE CAUSE

12) In May 2025, a multi-agency task force investigating **BEULAH** discovered evidence that **BEULAH** and **PHILLIPS** conspired to distribute heroin/fentanyl, marijuana, MDMA, and other controlled substances. Evidence collected via a confidential human source ("CHS"), surveillance, trash pulls, subpoenas, call-detail records, GPS tracking, and surveillance led to the May 30, 2025, arrests of **BEULAH** and **PHILLIPS**. In particular, officers observed **BEULAH** and **PHILLIPS** engage in a confirmed hand-to-hand drug transaction.  Significant quantities of heroin/fentanyl and other drugs were found in **BEULAH's** apartment, including in his bedroom and the apartment's kitchen.  Seized during **BEULAH's** and **PHILLIPS's** arrests were four cell phones used to coordinate narcotics transactions. Information provided by a CHS and one of **BEULAH's** drug customers confirmed that **BEULAH** uses a cell phone to arrange his drug-trafficking activities.  Probable cause exists to believe that these devices likely contain evidence of violations of 21 U.S.C. §§ 841 and 846 and 18 U.S.C. § 922(g)(1).

7

## PROPERTIES TO BE SEARCHED

13) This affidavit outlines the probable cause in support of the search of the **TARGET DEVICES** as described below, which were seized incident to the arrests of, and while in the possession of, **BEULAH** and **PHILLIPS**.  For the reasons described herein, there is probable cause to believe the **TARGET DEVICES** were used in the furtherance of drug trafficking. The description of the **TARGET DEVICES** is as follows:

| Target Device | Reference | Location Found |
|---|---|---|
| Black Apple iPhone contained in a black case | **TARGET DEVICE-1** | **BEULAH's Green Dodge Charger** |
| Tan Apple iPhone | **TARGET DEVICE-2** | **BEULAH's Green Dodge Charger** |
| Black Apple iPhone contained in a black case | **TARGET DEVICE-3** | **PHILLIPS's Red Tesla Sedan** |
| Purple Apple iPhone | **TARGET DEVICE-4** | **PHILLIPS's Red Tesla Sedan** |

14) This Affidavit of Probable Cause is submitted in support of the search of the **TARGET DEVICES**. The **TARGET DEVICES** are more particularly described in Attachments A-1 through A-4.

## ORIGIN OF INVESTIGATION

15) During the month of March 2025, the Delaware Violent Crimes Safe Streets Task Force ("DVCSSTF") and NCCPD's High Risk Offenders Team obtained information from a confidential human source ("CHS-1") regarding a black male known as "Rosé" who was said to be distributing large quantities of heroin/fentanyl and marijuana throughout the County of New Castle, Delaware. CHS-1 identified Rosé's phone number as 302-332-9871 and stated that he/she believed Rosé to be residing and distributing narcotics out of his residence, alleged

to be within building 1349 Maple Avenue, Wilmington, DE. CHS-1 stated that Rosé uses a cell phone to arrange drug transactions.

16) Task Force Officer Alexis Schupp of the DVCSSTF was provided the information above and recognized the nickname "Rosé" as belonging to a subject identified as **BEULAH** through previous, unrelated investigations. CHS-1 was shown a photograph of **BEULAH** and positively **BEULAH** as the person he/she knew to be Rosé.

17) Further government database inquiries into **BEULAH** revealed a green Dodge Charger bearing Delaware registration – 618111 registered in his name.

18) On April 24, 2025, investigators served an FBI administrative subpoena to Maple Walk Apartments, requesting occupancy and tenant information. A subpoena return revealed a Daronce **BEULAH** as the renter of 1349 Maple Avenue, Apt. 2.

19) **BEULAH** was determined to have a criminal history comprised of the following felony convictions in the State of Delaware:

   a. Drug Dealing in a Tier 2 Quantity (Disposition Date: 10/29/2020)

   b. Drug Dealing in a Tier 2 Quantity (Disposition Date: 10/10/2016)

   c. Conspiracy in the 2nd Degree (Disposition Date: 10/10/2016)

   d. Drug Dealing in a Tier 4 Quantity (Disposition Date: 09/18/2014)

   e. Carrying a Concealed Deadly Weapon (Disposition Date: 03/10/2014)

20) During the course of the investigation, investigators utilized various investigative methods, including but not limited to physical and electronic surveillance, subpoenaed records, and a trash pull (i.e., an investigative technique where investigators examine property that a target abandons by placing it in a container designated for trash removal). As described throughout

9

this affidavit, the results of these methods further reinforced the belief that **BEULAH** was engaging in drug sales and the possession of drugs with the intent to distribute them.

## DRUG INVESTIGATION OF BEULAH

### Surveillance Activities Reveal BEULAH Conducting a Suspected Hand-to-Hand Drug Transaction

21) On April 21, 2025, investigators conducted a surveillance operation on 1349 Maple Avenue, Wilmington, DE 19805. Investigators observed **BEULAH's** green Dodge Charger bearing Delaware registration – 618111 parked on Maple Avenue in Wilmington, Delaware, in front of the 1349 building.

22) At approximately 1100 hours, an unknown black male was observed exiting the building at 1349 Maple Avenue and entering the Charger's front driver's seat. The vehicle was followed to the Eagle Fuel Gas Station and the Family Dollar Store located on Kirkwood Highway, before returning to 1349 Maple Avenue.

23) At approximately 1145 hours, the same black male exited 1349 Maple Avenue and approached the driver's side of a silver Subaru SUV that had arrived in the area. Det. Randazzo observed the black male provide the operator with a bag containing a green substance which, in his training and experience, was consistent with marijuana, in exchange for money. After the exchange, the Subaru departed the area, and the black male entered 1349 Maple Avenue.

24) On April 24, 2025, investigators conducted a surveillance operation at 1349 Maple Avenue. At approximately 1430 hours, I observed **BEULAH** exit the building and enter his Charger that was parked on Maple Avenue. **BEULAH** was followed to W 4th Street in Wilmington, where he was observed parking and entering 819 W 4th Street.

25) **BEULAH** exited the residence several minutes later and returned to his vehicle. **BEULAH** was then followed to the area of 323 W 23rd Street in Wilmington, where the vehicle parked. Det. Randazzo observed an unknown black female dressed in a white dress exit the residence and approach the Charger. The black female contacted **BEULAH** at the driver's side window, where Det. Randazzo observed what was believed to be a hand-to-hand exchange that, in his training and experience, was consistent with a hand-to-hand drug transaction. The contact between **BEULAH** and the unknown black female lasted for approximately 30 seconds before the female entered 323 W 23rd Street and **BEULAH** left the area.

**A Trash Pull Reveals Suspected Drug Packaging Coming from BEULAH's Apartment**

26) On May 5, 2025, investigators conducted a surveillance operation on 1349 Maple Avenue. At approximately 1400 hours, I observed an unknown black male, later identified as Stepheon MASON (**"MASON"**), exit 1349 Maple Avenue while carrying two black trash bags. **MASON** placed the bags on the trunk of the vehicle, entered the driver's seat, and drove towards the rear of the building where he was observed discarding the trash bags into a dumpster.

27) After watching **MASON** return to 1349 Maple Avenue and enter the building, investigators collected the trash bags and transported them to a secure location to sort for evidence.

28) While reviewing the contents of the bags, investigators located a green cellophane wrapper with a white sticker labeled "hey yes." Through my training and experience, I am aware that the green cellophane wrapper is commonly utilized to package large quantities of heroin/fentanyl and that the label reading "hey yes" is consistent with the stamp or brand commonly found on a single bag of heroin/fentanyl. These stamps or insignias typically serve

as a brand—often used for purposes akin to marketing—for a particular batch or source of heroin/fentanyl.

29) Also located within this same bag was an unknown police agency's evidence bag which read "Ewell, James" and "24-000259."[1]

30) Law Enforcement inquires revealed the stamp "hey yes" was recovered during numerous heroin/fentanyl possession and drug sale investigations throughout New Castle and Kent Counties.

**<u>Call Detail Record Analysis Connects One of BEULAH's Suspected Phone Numbers to the Person Who Operated His Vehicle on April 25th and Who Discarded the Suspected Drug Packaging on May 5th</u>**

31) On April 17, 2025, an FBI administrative subpoena was issued to Verizon for the phone number CHS-1 associated with **BEULAH**, 302-332-9871, requesting subscriber information and call detail records (i.e., metadata logs of telecommunications events, such as phone calls, text messages, and data usage). On May 12, 2025, a subpoena return was received, revealing no subscriber information associated with that phone number.

32) However, a review of the call detail records revealed that one of the top callers of this phone number was 302-353-9832. An analysis of the -9832 phone number revealed a Stepheon Ledre **MASON** to be associated with the number. Investigators conducted a law enforcement query on **MASON**, a photograph of whom law enforcement recognized as the subject who operated the green Dodge Charger registered to **BEULAH** on April 25, 2025, and the subject responsible for discarding the trash evaluated after the aforementioned trash pull.

---

[1] I am not aware of any connection between the name and apparent case number listed on the evidence bag and the current investigation.

**Investigators Begin Tracking BEULAH's Charger Pursuant to a GPS Warrant**

33) On May 14, 2025, I sought and obtained a warrant seeking GPS tracking privileges for **BEULAH's** 2021 Green Dodge Charger bearing Delaware registration - 618111. The warrant was signed and approved by the Honorable Judge Calvin Scott in the New Castle County Superior Court of the State of Delaware.

34) On May 15, 2025, the GPS tracking device was installed on the Charger after it was located in the area of 1349 Maple Avenue.

**One of BEULAH's Drug Customers Reveals BEULAH is a Drug Dealer Who Uses the Alias "Rosé" and Uses a Cell Phone to Arrange Drug Transactions**

35) On May 27, 2025, at approximately 1545 hours, investigators conducted a surveillance operation on 1349 Maple Avenue. At approximately 1700 hours, Det. Randazzo observed a maroon Chevrolet Equinox bearing Delaware registration – PC233708 arrive in the area and park directly in front of **BEULAH's** Charger on Maple Avenue.

36) The Equinox remained occupied and running for several minutes before investigators observed **BEULAH** exit building 1349 and approach the Equinox. Det. Randazzo observed **BEULAH** grasping something within his right hand. **BEULAH** then reached his right hand in the Equinox through the passenger side window and appeared to engage in what Det. Randazzo believed, based on his training and experience, to be a suspected hand-to-hand transaction.

37) After the brief exchange, the Equinox departed the area and was followed by undercover investigators. A vehicle stop was ultimately conducted on the Equinox for a moving violation in the area of Kirkwood Highway and St. James Church Road, where contact was made with the operator and sole occupant.

38) The Equinox's operator consented to a search of his vehicle, within which investigators discovered a single circular blue pilled labeled "M15," located within the center console. I know from my training and experience that pills labeled "M15" typically contain oxycodone hydrochloride, a Schedule II controlled substance. The operator was then taken into custody without incident and provided post-*Miranda* statements. Specifically, he stated that he had just purchased two Oxycodone pills from a "friend" named "Rosé." He stated that he met "Rosé" at his apartment on Maple Avenue and purchased the pills for $20 apiece. He also stated that he had contacted "Rosé" on his cell phone, using the number 302-332-9871, to facilitate the purchase.

### Investigators Arrest BEULAH and PHILLIPS, and Seize the TARGET DEVICES, After Watching Them Engage in a Hand-to-Hand Drug Transaction

39) On May 30, 2025, at approximately 1340 hours, investigators conducted a surveillance operation on 1349 Maple Avenue. NCCPD Det. Mike Guarino observed **BEULAH** exit the building at 1349 Maple Avenue carrying a grocery bag that appeared to be weighed down with something inside it. **BEULAH** entered his Charger with the grocery bag and left the area.

40) Surveillance was continued on the Charger to the area of S Rodney Street and E Latimer Place, where it parked in the area of the Cleland Heights Liquor Store. Investigator briefly lost sight of the Charger and, upon reacquiring a visual, Det. Guarino observed a black male wearing all black clothing and long dreadlock-style hair exiting the passenger side of the green dodge Charger while carrying the same black shopping bag **BEULAH** was observed carrying from

14

his residence. This subject, later identified as **PHILLIPS**, secured the bag within a red Tesla sedan (DE Temp XQ638912) that was parked nearby.[2]

41) **PHILLIPS** was then observed counting a large quantity of currency in the roadway, which he handed to **BEULAH** through the driver side window of his Charger. **PHILLIPS** then returned to the red Tesla and left the area.

42) Surveillance was continued on the Tesla, at which time Det. Randazzo observed the vehicle turn right onto Cedar Street from Maryland Avenue without giving a proper turn signal. The Tesla then made an immediate left turn onto Anchorage Street from Cedar Street, again failing to signal its intention to turn. It should also be noted the vehicle turned left down Anchorage Street, which is a one-way street toward Cedar Street. Further, a traffic control sign stating "one way" was present and clearly visible at the intersection of Cedar Street and Anchorage Street.

43) This information was relayed to assisting investigators, at which time Sgt. Landis conducted a traffic stop on the Tesla. Investigators contacted the operator, who was identified as Karon **PHILLIPS**, as well as two juveniles.

44) **PHILLIPS** was requested to exit the vehicle and subsequently detained pursuant to the drug investigation and based on the suspected hand-to-hand drug transaction they observed at the liquor store. A search of **PHILLIPS's** person revealed two bundles of what investigators suspected, based on their training and experience, to be heroin/fentanyl that contained 30 baggies with blue wax paper stamped "cyber truck." As described above, drugs are often

---

[2] Investigators later obtained surveillance camera footage from the liquor store, which confirmed that **PHILLIPS** walked from the Tesla to **BEULAH's** Charger and entered the Charger. This footage also corroborated the remainder of what is described in this and the following paragraph.

stamped with a "brand" for purposes akin to marketing.  Also located on **PHILLIPS's** person was what investigators suspected, based on their training and experience, to be crack cocaine located within a single clear and knotted baggie.

45) A search of the Tesla was also conducted, which revealed 40 bundles of suspected heroin/fentanyl that contained 597 baggies with blue wax paper stamped "Gucci."  This suspected heroin/fentanyl was located within the same black bag with which Det. Guarino observed **BEULAH** exit 1349 Maple Avenue. This was also the same bag **PHILLIPS** was observed retrieving from the Charger during the suspected drug transaction at Cleland Heights Liquor Store.

46) During a further search of the Tesla, investigators located **TARGET DEVICE-3** and **TARGET DEVICE-4**. The phones were located on the front driver's dashboard and on the front passenger's side floorboard, within reach of **PHILLIPS**.  The other two occupants of the vehicle—both of whom were juveniles—were located in the back seat of the Tesla.

47) Surveillance was also maintained on **BEULAH,** at which time a traffic stop was conducted on the Charger in the area of Orange Street and 6th Street. **BEULAH**, who was the only person present in the Charger at the time, was taken into custody without incident, and a search of his person was conducted. During the search, investigators located United States Currency in the amount of $1,406.00. A search of the vehicle revealed **TARGET DEVICE-1** and **TARGET DEVICE-2** located within the center console.

**Execution of the Search Warrant at BEULAH's Apartment Revealed Drugs and Ammunition in a Bedroom Identified as BEULAH's and Additional Drugs and Paraphernalia in the Apartment**

48) Det. Randazzo authored a residential search warrant for 1349 Maple Avenue, Apt 2, Wilmington, DE 19805. The warrant was approved by the Honorable J. Hudson of the Delaware Justice of the Peace Court 2. The warrant was executed at 1630 hours. Investigators used a key seized from **BEULAH** to enter the door to Apartment 2.

49) Investigators contacted three occupants within the apartment: **MASON**, an adult female, and a juvenile female.

50) During the execution of the residential search warrant, the following was located:

- Within multiple kitchen cabinets, investigators located:

    o A large clear plastic bag containing a total of 449 blue wax paper bags stamped "Gucci" and "Get Hooked" containing suspected heroin/fentanyl. The suspected heroin/fentanyl weighed approximately 13.47 grams;

    o Numerous clear plastic sandwich baggies containing 707 multicolored pills labeled "Redbull," "FB," and "Spiderman." These pills tested positive for Amphetamine/Methamphetamine ("MDMA") using a Nark test kit.

    o Several empty pill bottles with the label ripped off as well as a bottle with the name "Daronce Beulah";

    o A clear knotted baggie containing a white powdery substance that investigators suspected to be heroin/fentanyl. This substance weighed approximately 4.7 grams and field-tested positive for fentanyl using a TruNark Ramen Spectrometer;

17

- o Several glass mason jars with suspected raw marijuana, packaged in numerous individual clear plastic sandwich baggies. This suspected raw marijuana weighed approximately 688.63 grams and field-tested positive using a Sirchi test kit; and

- o Several digital scales and sandwich baggies, which in my training and experience are oftentimes used to weigh and package drugs, respectively.

- Within a bedroom located to the right of the bathroom, which the adult female occupant of the home identified as **BEULAH's** bedroom, investigators located

    - o A shoebox next to the door that contained 907 blue wax paper bags stamped "Gucci" containing suspected heroin/fentanyl. These bags were wrapped in bundles with white wax paper and weighed approximately 27.21 grams.

    - o $3,000 in United States Currency, which was located within a shoe;

    - o A "glock" gun box was located under the shoebox containing suspected heroin/fentanyl. Within the gun box were three magazines of .40-caliber firearm ammunition; and

    - o Several forms of identifying documentation, including mail addressed to **BEULAH** and a U.S. passport for **BEULAH**, as well as pictures displaying **BEULAH** throughout the room.

- Located in a bedroom to the left of **BEULAH's** room, which **MASON** identified as his bedroom, was the following: 14 clear sandwich baggies containing suspected raw marijuana weighing approximately 172.47 grams as well as paraphernalia indicative of illicit drug sales (i.e., sandwich baggies and a digital scale).

**PHILLIPS Admits in a Post-*Miranda* Interview that He Distributes Drugs and Purchased Drugs from "Rosé" at the Liquor Store on May 30, 2025**

51) Det. Randazzo and I conducted a formal interview with **PHILLIPS** at NCCPD Headquarters. **PHILLIPS** knowingly and voluntarily signed a *Miranda* warning waiver form and, after being read his *Miranda* rights, agreed to speak to investigators in reference to this investigation. During questioning, **PHILLIPS** indicated that he had arrived at the liquor store to purchase the drugs from "Rosé." **PHILLIPS** stated that he personally distributes heroin and crack cocaine to financially support his family.

52) Investigators attempted to interview **BEULAH**; however, he invoked his right to counsel.

\* \* \* \* \*

53) I submit that reviewing information extracted from the **TARGET DEVICES** is likely to provide information about the **TARGET OFFENSES**, specifically **BEULAH's** and **PHILLIPS's** trafficking of drugs and **BEULAH's** possession of ammunition, including how and where **BEULAH** and **PHILLIPS** have purchased or sold drugs and how or where **BEULAH** may have obtained the ammunition found in his bedroom.[3]  I further submit that obtaining this information dating back to March 1, 2025, which represents the time period

---

[3] Notably, while investigators identified at least one phone number, the number ending in -9871, as a phone number **BEULAH** uses to coordinate his drug activities, investigators do not know which of the two **TARGET DEVICES** seized from **BEULAH's** possession is associated with which phone number.  Additionally, it is likely based on **BEULAH's** modus operandi and my training and experience about drug dealers' use of multiple cell phones to arrange drug transactions that **BEULAH** and **PHILLIPS** used a cell phone to arrange their May 30, 2025, drug transaction. Thus, there is probable cause to believe that all four **TARGET DEVICES** found in **BEULAH's** and **PHILLIPS's** vehicles may contain evidence of **BEULAH's** and **PHILLIPS's** drug-trafficking activities.

around when the investigation into **BEULAH** began, is reasonably calculated to produce evidence of the **TARGET OFFENSES**.  Based on my training and experience, this time period is a reasonable amount of time during which **BEULAH** or **PHILLIPS** could have been conspiring to sell or purchase drugs or when **BEULAH** may have obtained the ammunition he constructively possessed on May 30, 2025, as well as any firearms he may have possessed during that timeframe.  For example, based on my training and experience, it is likely that drug dealers like **BEULAH** and **PHILLIPS** regularly obtain and work through supplies of drugs such that seeking evidence of their drug-trafficking activities dating back to three months prior to their arrest would not be unreasonable.

## <u>TECHNICAL TERMS</u>

54) Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, cellular telephone, or cell phone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and

moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

21

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA

users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

f.  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static – that is, long-term – IP addresses, while other computers have dynamic – that is, frequently changed – IP addresses.

h.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

23

55) Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the **TARGET DEVICES** have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. I also know that iPhones function in much the same ways a tablet functions and have many, if not all, of the same capabilities. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Through this investigation, I learned that **BEULAH** communicated with a CHS and drug customer about drug trafficking using a cellular phone. I have also learned, through my training and experience, that drug traffickers and illegal firearm or ammunition possessors frequently use cellular phones to arrange for the purchase, sale, and storage of drugs and firearms. I have further learned that, in many cases, drug traffickers and illegal firearm or ammunition possessors carry and use multiple cellular phones to conduct illicit activities in an attempt to avoid detection from law enforcement. Therefore, I submit there is probable cause to believe that the data stored on the **TARGET DEVICES** will produce evidence of the **TARGET OFFENSES**, such as how, where, and when **BEULAH** and **PHILLIPS** possessed and sold drugs and how, where, and when **BEULAH** possessed and purchased ammunition. Additionally, I submit that the data will also show that **BEULAH** and **PHILLIPS** arranged for the transaction leading **PHILLIPs** to possess the drugs found in his vehicle and that **BEULAH** knowingly possessed the drugs and ammunition found in his apartment.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

56) Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

57) As further described in Attachments B-1 through B-4, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the **TARGET DEVICES** were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review

team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

58) Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying would permit the examination of the **TARGET DEVICES** consistent with the warrant. The examination may require authorities to employ techniques, including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

59) Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## <u>CONCLUSION</u>

60) In light of the above, I submit that there is probable cause to execute a search of the **TARGET DEVICES** associated with **BEULAH** and **PHILLIPS** that were seized by NCCPD subsequent to their arrests on May 30, 2025, because, among other reasons, (1) **BEULAH** and **PHILLIPS**

26

were arrested after being observed conducting a drug transaction; (2) **BEULAH** has an extensive criminal history related to the sale and distribution of illegal drugs, violence, and possession of firearms; (3) CHS-1 and the operator of the Equinox who was found with drugs in his possession both confirmed that **BEULAH** uses a cell phone to conduct drug-trafficking activities; (5) during a search of **BEULAH's** and **PHILLIPS's** vehicles, multiple cell phones were found [within their reach]; and (6) I know from my training and experience that drug dealers typically use multiple cell phones to arrange their drug-dealing activities.

61) As a result, I believe that the **TARGET DEVICES** will contain direct evidence of **BEULAH's** and **PHILLIPS's** drug-dealing offenses and **BEULAH's** ammunition possession offense and that this affidavit supports probable cause for a search warrant authorizing the examination of the **TARGET DEVICES** described in Attachments A-1 through A-4 to seek the items described in Attachments B-1 through B-4.

Respectfully submitted,

*/s/ Andrew P. Rosaio*
Andrew P. Rosaio
Task Force Officer
Federal Bureau of Investigation

Sworn to before me over the telephone
and signed by me pursuant to
Fed. R. Crim. P. 4.1 and 4(d) on
this ___25th___ day of September 2025

HONORABLE SHERRY R. FALLON
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1
## PROPERTY TO BE SEARCHED

1.     The property to be searched is a black Apple iPhone in a black case (hereinafter

"**TARGET DEVICE 1**") possessed by Daronce **BEULAH** (hereinafter "**BEULAH**") on May 30,

2025.  **TARGET DEVICE 1** is currently located at the New Castle County Police Department,

3601 N Dupont Hwy, New Castle, DE 19720.

2.     This warrant authorizes the forensic examination of **TARGET DEVICE 1** for the

purpose of identifying the electronically stored information described in Attachment B-1.

**ATTACHMENT A-2**
**PROPERTY TO BE SEARCHED**

1.      The property to be searched is a tan Apple iPhone (hereinafter "**TARGET DEVICE 2**") possessed by Daronce BEULAH (hereinafter "BEULAH") on May 30, 2025. **TARGET DEVICE 2** is currently located at the New Castle County Police Department, 3601 N Dupont Hwy, New Castle, DE 19720.

2.      This warrant authorizes the forensic examination of **TARGET DEVICE 2** for the purpose of identifying the electronically stored information described in Attachment B-2.

**ATTACHMENT A-3**
**PROPERTY TO BE SEARCHED**

1.      The property to be searched is a black Apple iPhone in a black case (hereinafter

"**TARGET DEVICE 3**") possessed by Karon **PHILLIPS** (hereinafter "**PHILLIPS**") on May 30,

2025.  **TARGET DEVICE 3** is currently located at the New Castle County Police Department,

3601 N Dupont Hwy, New Castle, DE 19720.

2.      This warrant authorizes the forensic examination of **TARGET DEVICE 3** for the

purpose of identifying the electronically stored information described in Attachment B-3.

**ATTACHMENT A-4**
**PROPERTY TO BE SEARCHED**

1.      The property to be searched is a purple Apple iPhone (hereinafter "**TARGET DEVICE 4**") possessed by Karon **PHILLIPS** (hereinafter "**PHILLIPS**") on May 30, 2025. TARGET DEVICE 4 is currently located at the New Castle County Police Department, 3601 N Dupont Hwy, New Castle, DE 19720.

2.      This warrant authorizes the forensic examination of **TARGET DEVICE 4** for the purpose of identifying the electronically stored information described in Attachment B-4.

**ATTACHMENT B-1**
**ITEMS TO BE SEIZED**

1.      All records on **TARGET DEVICE 1** described in Attachment A-1 that relate to violations of 21 U.S.C. §§ 841 (Possession of a Controlled Substance with Intent to Distribute) and 846 (Conspiracy to Distribute a Controlled Substance), that have been committed by **BEULAH** and **PHILLIPS**, and violations of 18 U.S.C. § 922(g)(1) (Possession of Ammunition by a Person Prohibited), that have been committed by **BEULAH** (together, the "**TARGET OFFENSES**") beginning March 1, 2025, including:

    a.  Lists of drug-trafficking customers and related identifying information;

    b.  Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c.  Any information related to sources of drugs, firearms, or ammunition (including names, addresses, phone numbers, or any other identifying information);

    d.  Any information regarding **BEULAH's** or **PHILLIPS's** schedule or travel relating to commission of the **TARGET OFFENSES**;

    e.  Any electronic calendars, notes, task lists, or other information relating to any person's whereabouts or activities relevant to commission of the **TARGET OFFENSES**;

    f.  Images, pictures, photographs, videos, or other visual depictions sent or received by **TARGET DEVICE 1**, regardless of the underlying program used to create, store, send, or receive such depictions, relating to commission of the **TARGET OFFENSES**;

32

g. GPS data showing the location and movement of **TARGET DEVICE 1** from March 1, 2025, through May 30, 2025;

h. Bank records, checks, credit card bills, account information, and other financial records related to commission of the **TARGET OFFENSES**; and

i. The content of any and all text messages or instant messages sent or received by **TARGET DEVICE 1**, regardless of the underlying program used to send and receive those messages, relating to commission of the **TARGET OFFENSES**.

2. Evidence of user attribution showing who used or owned **TARGET DEVICE 1** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

**ATTACHMENT B-2**
**ITEMS TO BE SEIZED**

1.    All records on **TARGET DEVICE 2** described in Attachment A-2 that relate to violations of 21 U.S.C. §§ 841 (Possession of a Controlled Substance with Intent to Distribute) and 846 (Conspiracy to Distribute a Controlled Substance), that have been committed by **BEULAH** and **PHILLIPS**, and violations of 18 U.S.C. § 922(g)(1) (Possession of Ammunition by a Person Prohibited), that have been committed by **BEULAH** (together, the "**TARGET OFFENSES**") beginning March 1, 2025, including:

   a.  Lists of drug-trafficking customers and related identifying information;

   b.  Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c.  Any information related to sources of drugs, firearms, or ammunition (including names, addresses, phone numbers, or any other identifying information);

   d.  Any information regarding **BEULAH's** or **PHILLIPS's** schedule or travel relating to commission of the **TARGET OFFENSES**;

   e.  Any electronic calendars, notes, task lists, or other information relating to any person's whereabouts or activities relevant to commission of the **TARGET OFFENSES**;

   f.  Images, pictures, photographs, videos, or other visual depictions sent or received by **TARGET DEVICE 2**, regardless of the underlying program used to create, store, send, or receive such depictions, relating to commission of the **TARGET OFFENSES**;

g.  GPS data showing the location and movement of **TARGET DEVICE 2** from March 1, 2025, through May 30, 2025;

h.  Bank records, checks, credit card bills, account information, and other financial records related to commission of the **TARGET OFFENSES**; and

i.  The content of any and all text messages or instant messages sent or received by **TARGET DEVICE 2**, regardless of the underlying program used to send and receive those messages, relating to commission of the **TARGET OFFENSES**.

2.  Evidence of user attribution showing who used or owned **TARGET DEVICE 2** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

35

**ATTACHMENT B-3**
**ITEMS TO BE SEIZED**

1.      All records on **TARGET DEVICE 3** described in Attachment A-3 that relate to violations of 21 U.S.C. §§ 841 (Possession of a Controlled Substance with Intent to Distribute) and 846 (Conspiracy to Distribute a Controlled Substance), that have been committed by **BEULAH** and **PHILLIPS** (together, the "**TARGET OFFENSES**") beginning March 1, 2025, including:

      a.  Lists of drug-trafficking customers and related identifying information;

      b.  Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      c.  Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

      d.  Any information regarding **BEULAH's** or **PHILLIPS's** schedule or travel relating to commission of the **TARGET OFFENSES**;

      e.  Any electronic calendars, notes, task lists, or other information relating to any person's whereabouts or activities relevant to commission of the **TARGET OFFENSES**;

      f.  Images, pictures, photographs, videos, or other visual depictions sent or received by **TARGET DEVICE 3**, regardless of the underlying program used to create, store, send, or receive such depictions, relating to commission of the **TARGET OFFENSES**;

      g.  GPS data showing the location and movement of **TARGET DEVICE 3** from March 1, 2025, through May 30, 2025;

h. Bank records, checks, credit card bills, account information, and other financial records related to commission of the **TARGET OFFENSES**; and

i. The content of any and all text messages or instant messages sent or received by **TARGET DEVICE 3**, regardless of the underlying program used to send and receive those messages, relating to commission of the **TARGET OFFENSES**.

2. Evidence of user attribution showing who used or owned **TARGET DEVICE 3** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

**ATTACHMENT B-4**
**ITEMS TO BE SEIZED**

1.      All records on **TARGET DEVICE 4** described in Attachment A-4 that relate to violations of 21 U.S.C. §§ 841 (Possession of a Controlled Substance with Intent to Distribute) and 846 (Conspiracy to Distribute a Controlled Substance), that have been committed by **BEULAH** and **PHILLIPS** (together, the "**TARGET OFFENSES**") beginning March 1, 2025, including:

a.   Lists of drug-trafficking customers and related identifying information;

b.   Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

c.   Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

d.   Any information regarding **BEULAH's** or **PHILLIPS's** schedule or travel relating to commission of the **TARGET OFFENSES**;

e.   Any electronic calendars, notes, task lists, or other information relating to any person's whereabouts or activities relevant to commission of the **TARGET OFFENSES**;

f.   Images, pictures, photographs, videos, or other visual depictions sent or received by **TARGET DEVICE 4**, regardless of the underlying program used to create, store, send, or receive such depictions, relating to commission of the **TARGET OFFENSES**;

g.   GPS data showing the location and movement of **TARGET DEVICE 4** from March 1, 2025, through May 30, 2025;

38

h.   Bank records, checks, credit card bills, account information, and other financial records related to commission of the **TARGET OFFENSES**; and

i.   The content of any and all text messages or instant messages sent or received by **TARGET DEVICE 4**, regardless of the underlying program used to send and receive those messages, relating to commission of the **TARGET OFFENSES**.

2.   Evidence of user attribution showing who used or owned **TARGET DEVICE 4** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.